UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-81862-CIV-WM

ANDREW MATEO DE ACOSTA,

     Plaintiff,

v.

NANCY A. BERRYHILL,
Commissioner of Social Security
Administration,

     Defendant.

_____/



FILED by _____ D.C.

MAR 2 6 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT [DEs 22, 23]

THIS CAUSE is before the Court upon Plaintiff, Andrew Mateo de Acosta's ("Plaintiff")

Motion for Summary Judgment [DE 22], and Defendant, Nancy A. Berryhill, Commissioner of

Social Security Administration's ("Defendant") Motion for Summary Judgment [DE 23].

Plaintiff filed a Reply Memorandum in Opposition to Defendant's Motion for Summary Judgment

and in Further Support of Plaintiff's Motion for Summary Judgment [DE 25].  The parties have

consented to magistrate judge jurisdiction.  [DE 16].  The issue before the Court is whether the

record contains substantial evidence to support the denial of benefits to the Plaintiff and whether

the correct legal standards have been applied.  *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir.

1988).

## I. FACTS

On April 30, 2013, Plaintiff filed a Title II application for a period of disability and

disability insurance benefits and a Title XVI application for supplemental security income,

asserting a disability on-set date of January 25, 2013. [R. 13].[1]  The claims were denied initially

and upon reconsideration.  *Id.*  Following a video hearing on March 16, 2015, the ALJ issued a

decision on May 15, 2015, denying Plaintiff's request for benefits.  [R. 13-25].  A request for

review was filed with the Appeals Council and denied on September 10, 2016.  [R. 1-6].

### A.  Hearing Testimony

The ALJ held a video hearing on March 16, 2015.  [R. 32].  Plaintiff testified that he was

born on March 27, 1966, so he was almost 49 at the time of the hearing.  [R. 36].  He is married

with a stepson who is no longer a minor.  *Id.*  At the time of the hearing, Plaintiff's home was

being foreclosed on.  *Id.*  Plaintiff drives approximately three times a week for short intervals to

go to the store.  [R. 38].  His highest level of education is a GED.  *Id.*  Plaintiff last worked on

January 25, 2013.  *Id.*  At first, Plaintiff stated that he stopped working because of his physical

and mental disabilities.  [R. 39].  However, when shown certain records by the ALJ, Plaintiff

stated that he was let go from his last job because he could not do his job anymore.  *Id.*  Plaintiff

testified that he is a minister, but he does not really do any "ministering."  *Id.*  In 15 years prior to

the hearing, he had only worked in construction and cabinetry.  *Id.*

Plaintiff explained that he cannot work because he cannot concentrate, cannot sit for long

lengths of time without having to get up, and suffers from a high level of pain.  [R. 40].  He takes

several pain medications, but they do not work and make it difficult for him to sleep, so he is very

tired during the day.  *Id.*  Plaintiff's doctors have told him that the Healthcare District will not

cover alternative medications.  [R. 41].  Plaintiff brought a cane to the hearing, but he

acknowledged that, while a doctor recommended that he use a cane, the doctor did not actually

prescribe a cane.  *Id.*  Plaintiff uses the cane when he has to travel a long distance, when his lower

---

[1] All references are to the record of the administrative proceeding filed by the Commissioner at Docket Entry 14.

back is "aggravated," or when his knee is hurting a lot. [R. 41-42].

Plaintiff explained that he was in pain at the hearing. [R. 42]. The pain was located in his lower lumbar area, radiating down into both knees and feet. [R. 43]. Plaintiff is in pain all of the time, and only the degree of pain changes. *Id.* Physical activity and any jarring of his lower back increase the pain. *Id.* Plaintiff has been using a lumbar support brace since 2006 or 2007 that was given to him by Dr. Rogers for driving. *Id.* The brace works "a little bit." [R. 44]. Plaintiff can usually only sit for 10-15 minutes at a time and can only stand for 10-20 minutes at a time depending on his pain level. *Id.* He can lift about 10 pounds. *Id.* Plaintiff's in-laws help take care of his wife. [R. 44-45]. Plaintiff can occasionally take his wife to the doctor, go to the store, or get a medication for her. [R. 45]. Plaintiff cannot cook, do dishes, vacuum, mop, do yard work, pay bills, or laundry. [R. 45-46]. He can clean a little bit, occasionally take the trash out, and make small trips to the grocery store. [R. 46].

Upon examination by Plaintiff's counsel, Plaintiff explained that he was let go from his last job because he was dealing with his back pain, could not concentrate, and took too long to complete one particular task. [R. 48]. Plaintiff was already receiving pain management from Dr. Rogers at that time. *Id.* At the time of the hearing, Plaintiff was no longer receiving any kind of pain management because he had no money and no health insurance. [R. 49].

Plaintiff testified that Dr. Stone recommended that Plaintiff get psychological counseling and surgery for his carpal tunnel syndrome. [R. 49-50]. He saw a Dr. Pedro two months prior to the hearing and was trying to arrange a surgery for his carpal tunnel syndrome. [R. 51]. Plaintiff suffers from head and hand tremors trigged by stress and anxiety. [R. 50].

Plaintiff stated that he sought treatment at Jerome Golden when he went through a deep depression over his wife's illnesses and the deaths of family members. [R. 50]. Jerome Golden

provides Plaintiff with medication to help with his pain, depression, anxiety, and nerve damage. [R. 54]. However, the medication provides no relief. *Id.*

Plaintiff testified that he has to lie down for at least a few hours on a typical day when his pain level is high. [R. 51-52]. He explained that he has his cane with him most of the time and uses it when his pain level is high. [R. 52]. His inability to work has caused him to lose his house and car, as well as the ability to do a lot of things. *Id.* Plaintiff cannot do a desk job because he has trouble sitting at the computer, he cannot work at a keyboard because of his carpal tunnel, and his lack of concentration would cause him to make too many errors. [R. 53]. The Healthcare District does not provide any kind of pain management, and Plaintiff's Tramadol simply "keeps [him] out of the hospital." [R. 54-55].

Matthew Lampley, the vocational expert, testified at the hearing. [R. 58]. The ALJ first posed a hypothetical in which an individual of the same age, education, and work experience as Plaintiff could work at the "light position level," but could only stand or walk for a total of four hours and sit for a total of six hours in an eight-hour workday, could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, could only occasionally handle and finger bilaterally, could never climb ladders, ropes or scaffolds, had to avoid concentrated exposure to vibration, environmental irritants, and hazards such as unprotected heights and dangerous machinery, and was only mentally capable of performing simple, routine, and repetitive tasks on a sustained basis. [R. 60]. The vocational expert explained that such an individual could not perform any of Plaintiff's past work. *Id.* He stated that such an individual could, however, perform the jobs of information clerk and usher. [R. 61]. With regard to the usher job, however, the availability of that job in the national economy would be eroded by 50% due to the individual's exertional level. *Id.*

4

The ALJ posed a second hypothetical in which an individual had the same limitations stated before except the exertional level was changed from light to sedentary. [R. 61]. The vocational expert testified that such an individual, due to the bilateral upper extremity restrictions, could not do any competitive work. [R. 62].

Plaintiff's counsel asked the vocational expert, in responding to the ALJ's hypothetical, whether he had taken into consideration the ability to maintain regular attendance and be punctual within the customary tolerance, as well as the ability to perform at a consistent pace. [R. 62]. The vocational expert responded that he had not considered those restrictions and offered to answer any hypothetical Plaintiff's counsel wished to pose. *Id.* Plaintiff's counsel also asked if the two jobs the vocational expert had identified would be precluded if an individual was missing three to four days of work per month. [R. 63]. The vocational expert responded that the two jobs would be precluded. *Id.*

Plaintiff's counsel then posed a hypothetical in which an individual of Plaintiff's age, educational background, and vocational background could sit for no more than two hours and could stand and walk for no more than two hours in a workday. [R. 63]. The vocational expert responded that such an individual would not have any jobs available to him. *Id.*

The vocational expert also stated that his testimony was in accordance with the DOT[2] and supplemented by his professional experience working in placing people with similar disabilities. [R. 63].

### B. Medical Record Evidence

In reaching his decision to deny Plaintiff's benefits, the ALJ reviewed the medical evidence of record, the relevant portion of which is summarized chronologically below.

---

[2] Dictionary of Occupational Titles

On April 3, 2006, Plaintiff had an MRI of the lumbar spine without contrast performed. [R. 379]. It was determined that Plaintiff had degenerative apophyseal joint changes and mild hypertrophic ligamentous change at L2-3, mild central canal stenosis due to hypertrophic facet and ligamentous changes at L3-4, hypertrophic central canal stenosis with degenerative apophyseal joint changes and mild broad disc bulging without focal disc herniation at L4-5, and mild degenerative apophyseal joint changes broad and predominantly central disc protrusion without neural foraminal stenosis, focal disc herniation or nerve root cut at L5-S1. *Id.* It was noted that Plaintiff had no focal lateralizing disc herniation or nerve root cut. *Id.*

On May 16, 2006, Plaintiff went to the emergency room at Jupiter Medical Center for his back pain. [R. 475]. Plaintiff reported that he had previously been seen at Palm Beach Pain Management, but he was in the process of changing insurance and had not been able to see a new pain management specialist yet. *Id.* Plaintiff was diagnosed with acute exacerbation of chronic back pain and was given several medications. [R. 476].

Plaintiff saw Dr. Irvine Mason of Neurology & Pain Management of the Palm Beaches, P.A., on December 18, 2008, but the doctor's notes are illegible. [R. 383-84]. On January 2, 2009, Dr. Mason prescribed Plaintiff a nasal CPAP full-face interface mask for his obstructive sleep apnea. [R. 73]. Dr. Mason recommended that Plaintiff lose weight and diagnosed Plaintiff with severe obstructive sleep apnea syndrome, abnormal sleep architecture with sleep fragmentation, and severe hypoxemia. [R. 75, 77].

Plaintiff saw Dr. Reed Stone of Palm Beach Neurology three times between February 11, 2010, and April 8, 2010, for his mild bilateral carpal tunnel and mild benign essential tremor. [R. 391-396]. The doctor tried multiple different medications, and Mysoline did ultimately improve Plaintiff's tremor with no significant side effects. [R. 391].

On May 28, 2012, Plaintiff went to the emergency room at Jupiter Medical Center due to persistent pain in his left foot. [R. 399]. An x-ray showed no lucent displaced fracture, but Plaintiff did have dorsal soft tissue swelling and a small calcaneal spur. *Id.*

On February 13, 2013, Plaintiff saw Dr. Anthony Rogers at Palm Beach Pain Management for continued management of his lumbago, lumbar radiculopathy, sacroiliac neuralgia, myofascial pain, and joint pain. [R. 455]. He indicated that his pain without medication was a 9 out of 10 and that his pain with medication was a 5 to 8 out of 10. *Id.* Plaintiff stated that the pain was in his back, radiated down to his legs and feet, and was made worse by physical activity. *Id.* Plaintiff explained he got "laid off", but he was going to look for work. *Id.* He also stated that he was under a lot of stress due to his mother-in-law being ill. *Id.* Plaintiff told Dr. Rogers that his medications were helping to control the pain and that he was more functional in his daily living when taking the medications. *Id.* Dr. Rogers prescribed pain medications and recommended that Plaintiff get a sleep study, sleep medication, and an EKG. [R. 455-56].

On March 13, 2013, Plaintiff saw Dr. Rogers for a follow-up. [R. 424]. He indicated that his pain without medication was a 9 out of 10 and that his pain with medication was a 7 or 8 out of 10. *Id.* Plaintiff described pain in his back that radiated to his buttocks, knees, and feet. *Id.* He stated that physical activity made the pain worse. *Id.* Dr. Rogers also noted that Plaintiff had arthritis and sleep apnea. *Id.* Dr. Rogers prescribed several pain medications and noted that Plaintiff might benefit from injection therapy but cannot afford it. [R. 424-25].

Plaintiff saw Dr. Rogers again on April 10, 2013, for continued pain management. [R. 420]. He told the doctor that pain medications help with his pain and that he was under a lot of stress because his daughter had died. *Id.* Dr. Rogers diagnosed Plaintiff with lumbago, lumbar radiculopathy, chronic pain, myofascial pain syndrome, facet pain, OA, depression, and anxiety.

7

*Id.* Dr. Rogers prescribed pain medication and noted that Plaintiff could not afford injections, physical therapy, or massage since he was uninsured. [R. 420-21].

On July 22, 2013, Plaintiff saw Dr. Bruce Barniville and reported that he was filing for disability due to his issues with chronic pain and tremors. [R. 581]. He also complained of bilateral shoulder pain. *Id.* The doctor refilled Plaintiff's medications and referred him to an orthopedist and a neurologist. [R. 581-82].

In a Disability Determination Explanation at the Initial Level dated July 22, 2013, Heather J. Hernandez, Ph.D., found that Plaintiff was only partially credible, as "the severity of the reported memory loss is not in line with objective medical findings." [R. 99]. She found that Plaintiff's mental impairment was not severe. *Id.* The State disability adjudicator/examiner, Vanessa Hurst, determined that Plaintiff is not disabled. [R. 105].

Plaintiff presented to Dr. Rommel R. Francisco of Atlantic Orthopaedics for the first time on August 21, 2013, for back and foot pain. [R. 609]. Dr. Francisco performed a physical examination and noted that Plaintiff had moderate and general swelling in his back, spasm, and negative Babinski test and straight leg test. [R. 610]. He also prescribed an MRI of the lumbosacral spine and the left foot. *Id.*

On August 22, 2013, Plaintiff presented to Dr. Stone, who he had not seen in years, and reported a history of tremor, which was only slightly resolved by taking Mysoline and had worsened, progressive problems with short-term memory and concentration, chronic low back pain, and mild hand numbness that had improved. [R. 480]. Plaintiff also stated that he lost his job, which had been stressful for him. *Id.* Dr. Stone diagnosed Plaintiff with depressive disorder, thoracic or lumbosacral neuritis or radiculitis (unspecified), memory loss, and tremors essential. [R. 481]. He noted that Plaintiff's cognitive problems were probably related to

Plaintiff's anxiety and impaired attention span and that Valium and Roxicet were contributing factors. *Id.* Dr. Stone also noted that Plaintiff needed a psychiatric evaluation. *Id.* Plaintiff had EMG nerve conduction velocity testing performed on the bilateral lower extremities. *Id.* Dr. Stone determined that all of Plaintiff's muscle showed normal insertion activity with no spontaneous activity at rest, motor recruitment was complete with normal motor unit morphology, and Plaintiff has no significant nerve root irritation in the lumbar region. *Id.* Plaintiff also had an EEG performed. [R. 483]. Dr. Stone found that the EEG resulted in a normal awake and drowsy recording with no focal lateralizing or paroxysmal activity. *Id.*

On August 29, 2013, Plaintiff had an MRI of his brain completed. [R. 489]. It was determined to be a normal MRI of the brain with no white matter lesions to suggest demyelinating process, infarct, or edema associated with neoplasm. *Id.*

On August 30, 2013, Plaintiff saw Julio D. Ochoa, PAC, of Atlantis Orothopaedics for bilateral shoulder pain. [R. 611]. Plaintiff reported that the pain caused difficulty sleeping, loss of motion, loss of strength, loss of coordination, difficulty dressing, and difficulty reaching items. *Id.* A physical exam and x-rays were completed. [R. 612]. PAC Ochoa noted that all of the test results were negative, that Plaintiff had complete range of movement and strength in both shoulders, and that the x-rays showed no fractures or dislocations. *Id.* He prescribed Plaintiff Zanaflex and referred him to physical therapy. *Id.*

On September 3, 2013, Plaintiff again saw Dr. Stone. [R. 485]. He reported continued anxiety. *Id.* Dr. Stone determined that Plaintiff needed a psychiatric evaluation and needed an MRI. [R. 486].

On September 5, 2013, Plaintiff saw Dr. Barniville for a follow-up appointment for pain management. [R. 497]. The doctor diagnosed Plaintiff with esophageal reflux, anxiety state

9

unspecified, essential/other forms of tremor, and spinal stenosis lumbar without neurogenic claudication. [R. 497-98]. Dr. Barniville referred Plaintiff to a podiatrist and an ophthalmologist. [R. 498].

On October 28, 2013, Plaintiff presented to the Jerome Golden Center for Behavioral Health ("Jerome Golden") for outpatient therapy. [R. 560]. He reported losing his job due to injury and mental health issues. *Id.* He also reported suffering from severe depression and anxiety, tremors that are not resolved with medication, panic attacks when feeling overwhelmed, not being able to sleep, and having a hard time dealing with mental and physical issues. *Id.* Plaintiff explained that his wife was suffering from a terminal illness. *Id.* He denied any suicidal ideation or hallucinations. *Id.* Plaintiff stated that his mental illness had started three or four years previously and that this was his first time seeking treatment. *Id.*

On November 6, 2013, Plaintiff saw Dr. Francisco for a re-check of his low back pain. [R. 613]. Plaintiff reported that his symptoms were moderate and worsening. *Id.* Dr. Francisco noted that Plaintiff had not improved since being seen three months prior, so the doctor prescribed an MRI of the lumbrosacral spine and Flexeril. [R. 614].

On November 13, 2013, Plaintiff saw Dr. Barniville and was provided with refills of his medications. [R. 585-86].

On November 19, 2013, Plaintiff had an MRI examination of the lumbar spine without contrast. [R. 516]. It was determined that Plaintiff had disc bulge and posterior spondylosis at L5-S1, disc bulge with associated annular tears at L4-5, levoscoliosis, and straightening of the lumbar lordosis. [R. 517].

On November 21, 2013, Plaintiff presented to Jerome Golden. [R. 556]. He reported terrible memory loss, hopelessness, loss of self-esteem, and some thoughts of death. *Id.* Dr.

Mary Groesbeck found that Plaintiff suffered from substance abuse, severe depression, agitation/hyperactivity, and severe anxiety. [R. 557]. She diagnosed Plaintiff with major depressive order, recurrent, without psychotic features; anxiety disorder; pain associated with psychological factors and general medical condition; tremor; back pain; and a GAF of 50. [R. 558].

On November 27, 2013, Plaintiff saw Dr. Francisco for his back pain. [R. 615]. Plaintiff reported that the pain was moderate and unchanged despite taking his medications. *Id.* Dr. Francisco noted that Plaintiff's recent MRI showed multilevel degenerative disc disease with stenosis. [R. 616]. He referred Plaintiff to a spine surgeon. *Id.*

On December 3, 2013, Plaintiff saw Dr. Stephanie Castiglia, a licensed psychologist, for a general clinical evaluation with mental status. [R. 519]. Plaintiff reported that he spent 85-90% of his day in bed due to his pain and the stress and anxiety of not being able to get help. *Id.* He also reported that he had a tremor which affected him both physically and emotionally. *Id.* Dr. Castiglia found that Plaintiff was oriented to person, place, and time; his attention was mildly impaired; his concentration was intact; his calculation skill was intact; his short-term memory was mildly impaired; his reasoning and abstract thinking were intact; and his judgment and insight were within normal limits. [R. 521]. Dr. Castiglia diagnosed Plaintiff with depressive disorder NOS, generalized anxiety disorder, back pain, occupational problems and financial problems, and a GAF of 70-75. [R. 522]. She noted that Plaintiff had "mild to moderate symptoms of depression and anxiety which are being exacerbated by his reported pain, limited physical abilities, and financial stress." *Id.* She recommended that Plaintiff get psychotherapy. *Id.* The doctor also noted that Plaintiff's "current mood symptoms are exacerbating his noted issues with attention and concentration" and "are exacerbating his reported pain levels." *Id.*

11

On December 10, 2013, Plaintiff presented to Dr. Charles Theofilos, a neurosurgeon, for his lower back pain. [R. 670]. Dr. Theofilos noted that Plaintiff reported significant symptoms of depression, forgetfulness, blurred vision, loss of sleep, numbness, and shoulder, leg, and low back pain. [R. 670-71]. Plaintiff told the doctor he had had some kind of disc procedure in 2003 but could not remember the details. *Id.* Dr. Theofilos noted that Plaintiff appeared to be in "moderate distress." [R. 671]. Upon examination of the lumbar spine, the doctor found that Plaintiff had moderate spasms, markedly decreased range of motion in all planes, pain elicited with flexion, extension, and axial rotation, and positive straight leg raise bilaterally. [R. 672]. Dr. Theofilos also reviewed Plaintiff's MRI results and then diagnosed him with mechanical lower back pain with lower extremity radiculopathy. [R. 673]. He told Plaintiff to get into a back strengthening program and stated that nothing surgical could be done. *Id.* Dr. Theofilos also noted that the Health Care District would not cover epidural injections. *Id.*

In a Disability Determination Explanation at the Reconsideration Level dated December 27, 2013, Gary Buffone, Ph.D., determined that Plaintiff was only partially credible, as "the severity of the reported memory loss is not in line with objective medical findings." [R. 117]. Dr. R. James Mabry found that Plaintiff's credibility "of pain symptom is now clouded by long narcotic use and presumed habituation. [Plaintiff's] reported limitations appear only partially credible, and disproportionate to PE's by multiple examiners. Mental impairment may amplify symptoms and limitations if depression present." [R. 120]. Dr. Mabry also found that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of four hours and sit for a total of six hours in an 8-hour workday, and push and/or pull an unlimited amount. [DE 119]. The State disability adjudicator/examiner, Dayna Furlough Ray, determined that Plaintiff is not disabled. [R. 123].

12

On January 21, 2014, Plaintiff went to Jerome Golden for a routine follow-up. [R. 553]. He reported that his current regimen was not helping with his depression or anxiety and that Neurontin had not helped with the pain. *Id.* Plaintiff explained that he has limited medications available to him due to costs. *Id.* Dr. Sultana recommended that Plaintiff's medications be changed. *Id.*

On January 30, 2014, Plaintiff saw Dr. Stone for re-evaluation. [R. 527]. Plaintiff reported significant ongoing depression and anxiety and explained that he had been seen at a local treatment center and had been on psychiatric medications. *Id.* Plaintiff also reported low back pain, numbness and tingling in his hands, and significant sleep difficulty. *Id.* Upon examination, Dr. Stone found that Plaintiff had moderate tenderness in the lumbosacral paraspinal muscles, reduced range of motion, and positive Tinel's and Phalen signs at the carpal tunnels bilaterally. [R. 528]. He determined that Plaintiff suffered from carpal tunnel syndrome, depressive disorder, thoracic or lumbosacral neuritis or radiculitis (unspecified) and tremors essential. *Id.* EMG/NCV testing revealed moderate bilateral carpal tunnel slowing, and Dr. Stone recommended that Plaintiff see an orthopedic surgeon. Dr. Stone also continued Plaintiff's medications for his depressive disorder and pain. *Id.* Finally, Dr. Stone performed an EEG on Plaintiff and determined that the results were normal. [R. 530].

On February 18, 2014, Plaintiff returned to Jerome Golden and reported that he generally stayed in his home due to his anxiety and back pain. [R. 550]. He also reported racing thoughts and difficulty sleeping but denied recent panic attacks. *Id.* Dr. Sultana increased Plaintiff's Effexor dosage. *Id.*

On February 28, 2014, Plaintiff saw Dr. Barniville, reported that his back pain was unchanged, and was provided with refills of his medications. [R. 587-88].

On March 3, 2014, Plaintiff saw Dr. Francisco for his right wrist pain. [R. 617]. Plaintiff reported pain mainly at the base of his thumb radiating to his forearm and only occasional numbness and tingling in the fingers. *Id.* Upon examining Plaintiff, Dr. Francisco noted that Plaintiff had tenderness over the first dorsal compartment with a positive Finkelstein's test and a negative Tinel sign in the carpal tunnel. [R. 618]. X-rays showed no acute bony abnormalities. *Id.* Dr. Francisco diagnosed Plaintiff with De Quervain's tenosynovitis, gave Plaintiff an injection, and referred him to physical therapy. *Id.* Dr. Francisco also noted that Plaintiff's symptoms were not consistent with carpal tunnel syndrome, so he prescribed a wrist splint. *Id.*

On March 18, 2014, Plaintiff returned to Jerome Golden for a medical follow-up. [R. 547]. He reported constant low back pain and said that he stayed in bed when at home. *Id.* Plaintiff reported that Tramadol is the only reason he is not in the hospital. *Id.* He also stated that his legs tremor, that he takes medication for severe muscle spasms, that money is a problem, and that his wife suffers from an incurable disease. *Id.* Defendant was prescribed Baclofen and Tramadol. *Id.*

On May 18, 2014, Plaintiff also had a psychiatric follow-up with Dr. Sultana. [R. 544]. Plaintiff reported that his wife told him she saw a difference in him on the current medications. *Id.* He also stated that his wife was dying, his house was being foreclosed on, he had lost his car, he was depressed, he had difficulty sleeping, and his tremors and anxiety were mostly under control when he took Diazepam. *Id.* Dr. Sultana increased Plaintiff's dose of Effexor for his mood symptoms. *Id.*

On April 10, 2014, Plaintiff presented to Dr. Stone for a follow-up. [R. 525]. He stated that he had seen another doctor and had an injection in the right hand, was using a wrist brace, and was on some new medications. *Id.* Dr. Stone continued Plaintiff's medication for his depressive

14

disorder and noted that Plaintiff may need surgery.  [R. 526].

Plaintiff returned to Jerome Golden on June 24, 2014, after he missed his April appointment.  [R. 541].  He reported that he had run out of medications, and he felt his depression returning.  *Id.*  Plaintiff was prescribed Effexor, Baclofen, Neurontin, and Tramadol.  [R. 542].

On June 30, 2014, Plaintiff saw Dr. Barniville and was provided with refills of his medications.  [R. 589-90].

On September 30, 2014, Plaintiff saw Dr. Barniville and requested a referral for carpal tunnel as he had had pain in the distal left forearm for over a month.  [R. 591].  Plaintiff told the doctor that over a month ago he had slipped in the kitchen and felt some tendons pop in his right arm when he tried to catch himself.  *Id.*  Dr. Barniville referred Plaintiff to an orthopedic surgeon.  [R. 592].

On November 4, 2014, Plaintiff saw Dr. Stone for a follow-up.  [R. 573].  He reported daily low back pain with unsteadiness of gait and explained that he used a cane to help him ambulate.  *Id.*  Plaintiff reported significant depression and anxiety, ongoing tremors treated with Diazepam, moderate carpal tunnel symptoms in both hands, and significant memory and concentration impairment.  *Id.*  Plaintiff explained that he had been told he was not a surgical candidate for his back issues and that he had gotten an injection in his right hand.  *Id.*  Dr. Stone continued Plaintiff's medication for his pain, depression, tremors, and insomnia.  [R. 574].

Plaintiff returned to Jerome Golden on November 5, 2014, after missing several appointments.  [R. 570].  He reported that one of his medications had run out, and he was in so much pain that he had gone to a neurosurgeon.  *Id.*  Plaintiff said that the neurosurgeon had told him he could not do anything for him due to Plaintiff's spinal stenosis and back injuries.  *Id.*

Plaintiff came to the appointment at Jerome Golden walking with a cane. *Id.* He stated that he was in severe pain and had applied for disability. *Id.* Plaintiff's mood was depressed, sad, and frustrated. *Id.* The staff provider noted that she could no longer provide Plaintiff with Tramadol. *Id.*

On November 5, 2014, Dr. Stone completed a Physical Residual Functional Capacity Questionnaire [DE 565-68]. He responded that Plaintiff's impairments lasted or can be expected to last at least twelve months, that emotional factors contribute to the severity of Plaintiff's symptoms and functional limitations, and that Plaintiff suffers from depression and anxiety. [R. 565]. Dr. Stone opined that Plaintiff can sit for 10 minutes at one time; can stand for 10 minutes at one time; can sit and stand/walk for less than two hours in an eight-hour work day; would need to include periods of walking around for ten minutes at a time every 30 minutes in an eight-hour work day; would need a job that permits shifting positions at will from sitting, standing, or walking; would need to take approximately three unscheduled breaks of 10-15 minutes each during an eight-hour work day; would need to have his legs elevated with prolonged sitting; and would need a cane or other assistive device when engaging in occasional standing/walking. [R. 566-67]. Dr. Stone also found that Plaintiff could rarely lift less than 10 pounds and could never lift more than 10 pounds; could only occasionally look down, turn his head left or right, look up, or hold his head in a static position; and could never twist, stoop, crouch/squat, climb ladders, or climb stairs. [R. 567]. Dr. Stone further opined that Plaintiff did not have significant limitations with reaching, handling, or fingering. *Id.* He responded that Plaintiff's impairments were likely to produce good and bad days, that Plaintiff would miss more than four days per month of work, that Plaintiff is incapable of even low stress jobs due to his depression and anxiety, that Plaintiff's impairments are reasonably consistent with the symptoms and functional limitations described in

16

the evaluation, and that Plaintiff's experience of pain or other symptoms would be constantly severe enough to interfere with attention and concentration needed to perform even simple work tasks. [R. 568].

Plaintiff returned to Jerome Golden on January 7, 2015. [R. 593]. It was noted that Plaintiff walked without a cane. *Id.* Plaintiff reported doing well on his medications, but stated that he was off Baclofen as it made him too "loopy." *Id.* His prescriptions for Effexor, Trazodone, and Neurontin were refilled. [R. 594].

On January 13, 2015, Plaintiff presented to Dr. Veronica Pedro, an orthopedic surgeon, for an evaluation of his bilateral hands. [R. 604]. It was noted that Plaintiff was independently ambulatory. *Id.* Dr. Pedro performed a physical exam and x-rays and diagnosed Plaintiff with bilateral carpal tunnel syndrome. [R. 604-5]. She gave Plaintiff injections in both the left and right carpal tunnels. [R. 605]. The doctor noted that, if the injections did not give Plaintiff relief, he would need surgical intervention. *Id.*

On February 12, 2015, Dr. Mehrunnisa Sultana from Jerome Golden filled out a Medical Opinion re: Ability to Do Work-Related Activities (Mental) form. [R. 597-98]. Dr. Sultana responded that Plaintiff was seriously limited, but not precluded, from maintaining regular attendance and being punctual within customary, usually strict, tolerances; responding appropriately to changes in a routine work setting; setting realistic goals or making plans independently of others; and using public transportation. [R. 597-98]. The doctor responded that Plaintiff was unable to meet competitive standards in (1) completing a normal workday and a normal workweek without interruptions from psychologically based symptoms; (2) performing at a consistent pace without an unreasonable number and length of rest periods; and (3) dealing with normal work stress, dealing with stress of semiskilled and skilled work' and traveling in an

17

unfamiliar place. *Id.* Dr. Sultana found that there was no listed category in which Plaintiff could not function at all. *Id.* For all of the other listed categories, the doctor found that Plaintiff was "limited but satisfactory" or "unlimited or very good." *Id.* Dr. Sultana noted Plaintiff's memory loss and his decreased functionality due to his pain and anxiety were factors that would cause Plaintiff to have difficulty working at a regular job on a sustained basis. [R. 598]. Dr. Sultana also responded that Plaintiff's impairments or treatment would cause him to be absent from work more than four days per month. *Id.*

On February 13, 2015, Dr. Rogers completed a form stating that he had treated Plaintiff from February 13, 2013, to April 10, 2013, and that Plaintiff suffers from cervicalgia, lumbago, lumbar stenosis, lumbar radiculopathy, lumbar herniated discs, myofascial pain, foot and ankle pain, and hypersomnelence. [R. 599]. Dr. Rogers stated that Plaintiff's muscle spasm, lumbar MRI results, and decreased range of movement were consistent with Plaintiff's complaints of pain. *Id.* Dr. Rogers concluded that, during the period of time in which he treated Plaintiff, Plaintiff would have missed more than four days of work per month due to his pain, stress, and poor sleep. *Id.* Dr. Rogers further explained that he tried to control Plaintiff's pain so that Plaintiff could return to normal activity, but he never accomplished this goal. *Id.*

### C. ALJ Decision

The ALJ issued his decision on Plaintiff's claim for benefits on May 15, 2015. [R. 13-25]. The ALJ explained the five-step sequential evaluation process for determining whether an individual is disabled. [R. 14-15]. He found that Plaintiff meets the insurance status requirements of the Social Security Act through June 30, 2018, and has not engaged in substantial gainful activity since January 25, 2013, the alleged onset date. [R. 15]. The ALJ then found that Plaintiff suffers from the following severe impairments: degenerative disc disease, carpal tunnel

18

syndrome, obstructive sleep apnea, anxiety, depression, and obesity. *Id.* He specifically noted that Plaintiff's benign essential tremors are a non-severe medically diagnosed impairment and that this impairment is controlled with medication. [DE 16].

The ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. [R. 16]. The ALJ determined that Plaintiff's obesity "is not attended with the specific clinical signs and diagnostic findings required to meet or equal the requirements set forth in the listings found in any musculoskeletal, respiratory, or cardiovascular body system listing affected by obesity," but also stated that he had considered Plaintiff's obesity in the residual functional capacity assessment. *Id.* He also noted that there was no evidence of nerve root compression, spinal arachnoiditis, or Plaintiff's inability to ambulate effectively. *Id.* With regard to the carpal tunnel syndrome, the ALJ explained that the medical evidence "does not suggest that [Plaintiff] has disorganization of motor functions." *Id.* Finally, the ALJ determined that the severity of Plaintiff's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.04 and 12.06 as Plaintiff has mild restrictions in activities of daily living, mild difficulties in social functioning, moderate difficulties with regard to concentration, persistence or pace, and no episodes of decompensation of an extended duration. [R. 16-17]. The ALJ also found that the listing 12.04 "paragraph C" criteria had not been met in this case. [R. 18].

The ALJ found that Plaintiff has

the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with additional limitations. He can stand or walk for a total of 4 hours, and sit for about 6 hours in an 8-hour workday. He can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, but never climb ladders, ropes or scaffolds. He can occasionally handle and finger

19

bilaterally. He should avoid concentrated exposure to vibration, environmental irritants, and hazards, such as unprotected heights and dangerous moving machinery. [Plaintiff] is mentally capable of performing simple routine and repetitive tasks on a sustained basis.

[R. 18].

The ALJ attested that he had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all of the opinion evidence. [R. 19]. He then followed the two-step process—first, determining whether there is an underlying determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit his functions. *Id.* The ALJ summarized Plaintiff's hearing testimony and found that the Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." *Id.* He went through the various medical records in detail and identified inconsistencies between the record evidence and Plaintiff's testimony. [R. 19-21].

The ALJ pointed out that the records show that Plaintiff's back pain is not accompanied by radiculopathy and that Plaintiff's back pain is not treated with chronic pain management or injections. [R. 19-20]. However, the ALJ also explained that Plaintiff had recently had trouble obtaining certain medical treatment for his back pain due to his lack of insurance and financial difficulties. [R. 20]. The ALJ found that, while the record does show that Plaintiff has some pain in his hands, he reported in 2013 that his hand numbness had improved and has only received

20

conservative medical treatment for his carpal tunnel syndrome. *Id.* The ALJ explained that Plaintiff is obese and that his obesity is treated with medication. *Id.* Next, the ALJ determined that Plaintiff does not require the use of an assistive device and uses a cane at times despite never having been prescribed one. *Id.* Finally, the ALJ found that the objective medical evidence did not support Plaintiff's allegations about the severity of his mental impairments. [R. 20-21].

The ALJ specifically noted that Plaintiff's "inconsistent statements erode the credibility of his allegations." [R. 21]. The ALJ explained that Plaintiff had initially stated at the hearing that he was unable to work because of his disabilities; however, after being confronted with the evidence, Plaintiff later stated that he had been laid off. *Id.* The ALJ found that "not being credible with this minor issue detracts from [Plaintiff's] credibility as a whole." *Id.* The ALJ concluded that Plaintiff's subjective allegations were not "entirely credible" as they were not "well supported by and consistent with the overall evidence of record." *Id.* He did, however, add certain limitations to the RFC to account for Plaintiff's severe impairments. *Id.* With regard to opinion evidence, the ALJ noted Plaintiff's GAF scores in the record. [R. 21]. He explained that he had "considered these GAF ratings and afforded them little weight because they are mere snapshots of [Plaintiff's] functioning during specific periods of time." [R. 22].

The ALJ assigned partial weight to the opinion of Dr. Anthony Rogers because Dr. Rogers was Plaintiff's treating physician, and his opinion was consistent with objective medical evidence showing some back pain. [R. 22]. However, the ALJ noted that the objective medical evidence also showed that Plaintiff "had full strength in his upper and lower extremities and a normal gait and station." *Id.* The ALJ assigned little weight to the opinion of Dr. Mehrunnisa Sultana because the "form that she completed consisted of check off boxes, which are entitled to little weight in the adjudicative process." *Id.* Finally, the ALJ assigned little weight to the opinion of

21

Dr. Reed Stone because his opinion was not consistent with the record as a whole. *Id.* The ALJ explained that Plaintiff's back pain is not accompanied by radiculopathy, Plaintiff does not require the use of an assistive device, and Plaintiff has full muscle strength in his upper and lower extremities. *Id.*

The ALJ did not state how much weight he gave to the State Agency single decision maker, Venessa Hurst, SDM. [R. 22]. The ALJ assigned partial weight to the opinion of Dr. R. James Mabry, a State agency medical consultant because the opinion was "consistent with evidence showing back pain and the prescription of narcotic medication." [R. 23]. However, the ALJ noted that Dr. Mabry is a non-examining source and that he did not consider the fact that Plaintiff's carpal tunnel syndrome impairment was treated with injections. *Id.* The ALJ assigned little weight to the opinions of Heather J. Fernandez, Ph.D., a State agency medical consultant, and Gary W. Buffone, Ph.D., a State agency medical consultant at the reconsideration level, because they are non-examining medical sources, and their opinions were "not consistent with subsequent objective medical evidence showing mild limitations with short-term memory and attention attributed to [Plaintiff's] mental impairments." *Id.*

The ALJ next found that Plaintiff is unable to perform any past relevant work pursuant to the vocational expert's testimony at the hearing in response to the ALJ's hypotheticals. [R. 23]. He noted that Plaintiff was born on March 27, 1966, and was 46 years old on the alleged disability onset date. [R. 24]. The ALJ explained that Plaintiff has at least a high school education and is able to communicate in English. *Id.* The ALJ also explained that transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that Plaintiff is "not disabled" whether or not Plaintiff has transferable job skills. *Id.* He concluded that, considering Plaintiff's age, education, work experience, and RFC, there are jobs

22

that exist in significant numbers in the national economy that Plaintiff can perform, including information clerk and usher. [R. 24-25]. The ALJ found that the vocational expert's testimony was consistent with the information found in the DOT. [R. 25]. The ALJ concluded that Plaintiff has not been under a disability since January 25, 2013, through the date of the decision. *Id.*

## II. **MOTIONS FOR SUMMARY JUDGMENT**

In his Motion for Summary Judgment, Plaintiff makes three main arguments. [DE 22]. First, he argues that the ALJ erred by not giving controlling weight to the opinions of three of Plaintiff's treating physicians, Dr. Rogers, Dr. Sultana, and Dr. Stone. *Id.* Second, Plaintiff contends that the ALJ failed to properly evaluate Plaintiff's complaints of disabling pain and his overall credibility. *Id.* Third, Plaintiff asserts that the ALJ erred in posing an incomplete hypothetical to the vocational expert and by failing to obtain a reasonable explanation for the conflict between the vocational expert's testimony and the Dictionary of Occupational Titles ("DOT"). *Id.*

In Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion for Summary Judgment [DE 24], she contends that the ALJ's decision is supported by substantial evidence in the record, the ALJ was not compelled to accept the treating physicians' opinions regarding significant limitations, and the vocational expert's testimony provided substantial evidence that Plaintiff could perform a significant number of jobs in the national economy.

## III. **LEGAL ANALYSIS**

Judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal

standards. Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997)). Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)-(f). The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry concludes. 20 C.F.R. § 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the

24

listing of impairments. 20 C.F.R. § 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. *See Gibson v. Heckler*, 762 F.2d 1516, 1518, n. 1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established. 20 C.F.R. § 404.1520(e). The burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she is able to perform work in the national economy in light of the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239. In order to determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app.2, or utilize the assistance of a vocational expert. *See Phillips*, 357 F. 3d at 1239-40.

A. Whether the ALJ erred by not giving controlling weight to the treating physicians

Plaintiff asserts that the ALJ's "reasons for failing to give controlling weight to the opinions from Mr. De Acosta's treating physicians are not based on substantial evidence." [DE 22 at p. 11]. Plaintiff argues that the ALJ should not have given little weight to Dr. Sultana's opinion just because she completed a form that contained check-off boxes; rather, the ALJ should have considered whether Dr. Sultana's opinion was well-supported by medically acceptable clinical and laboratory diagnostic techniques and whether it was consistent with the other substantial evidence in the record. *Id.* at p. 12. Next, Plaintiff contends that the ALJ failed to

explain how Dr. Stone's opinion was not well-supported by the medically acceptable clinical and laboratory diagnostic techniques and how Dr. Stone's opinion was inconsistent with other substantial evidence in the record. *Id.* at pp. 12-13. Finally, Plaintiff argues that the ALJ "cherry picked" Dr. Rogers' opinion and ignored certain findings in the doctor's notes. *Id.* at pp. 13-14.

Defendant first argues that, since neither Dr. Sultana nor Dr. Rogers stated that the limitations to which they opined would last for at least a twelve-month period, their opinions "do not show that Plaintiff's conditions met the definition of disability." [DE 24 at p. 13]. Next, Defendant contends that Plaintiff "fails to show Dr. Sultana or Dr. Rogers were treating physicians whose opinions were due any special deference." *Id.* Defendant also argues that substantial evidence supports the ALJ's rejection of the three doctors' opinions. *Id.* at p. 14. Finally, Defendant asserts that Dr. Sultana's "form opinion contains no reference to any clinical evidence in support of the opined limits" and that Plaintiff "fails to show the ALJ's reason for rejecting Dr. Sultana's opinion was improper under the law or contrary to the weight of the evidence." *Id.*

In reply, Plaintiff argues that, in its motion, Defendant improperly engaged in re-writing the ALJ's decision both by arguing that Dr. Sultana was not a treating physician and by claiming that the ALJ had multiple reasons to discount the opinion of Dr. Sultana. [DE 25 at p. 3].

The Eleventh Circuit Court of Appeals has explained that an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion," but that the ALJ is required "to state with particularity the weight he gives to different medical opinions and the reasons why." *McCloud v. Barnhart*, 166 Fed.Appx. 410, 418-419 (11th Cir. 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983); *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)). The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis*, 125 F.3d at 1440. "[G]ood cause" exists

when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1241. If the ALJ decides to disregard the opinion of a treating physician, the ALJ must clearly articulate his or her reasons for doing so. *Id.*

### Dr. Mehrunnisa Sultana

As Dr. Mehrunnisa Sultana was a treating physician of Plaintiff, her opinion should have been accorded considerable weight unless the ALJ had good cause to not give it considerable weight and the ALJ clearly articulated his reasons for doing so. In the case at hand, the ALJ assigned little weight to the opinion of Dr. Sultana because the "form that she completed consisted of check off boxes, which are entitled to little weight in the adjudicative process." [R. 22]. The Eleventh Circuit has held that "[t]he treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory." *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991) (citing *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987)). Here, Dr. Sultana completed a Medical Opinion re: Ability to Do Work-Related Activities (Mental) [R. 497-98], which consists almost completely of check marks without any explanation whatsoever. The opinion appears to be wholly conclusory. Moreover, Dr. Sultana's notes in the record are extremely limited, so there is no support for her opinion anywhere in the record. Therefore, the ALJ properly explained that he was giving Dr. Sultana's opinion little weight, clearly explained his rationale for that finding, and had good cause for not giving Dr. Sultana's opinion considerable weight.

Second, "when an incorrect application of the regulations results in harmless error because the correct application would not contradict the ALJ's ultimate findings, the ALJ's decision will

stand." *Miller v. Barnhart*, 182 F. App'x 959, 964 (11th Cir. 2006) (citing *Diorio v. Heckler,* 721 F.2d 726, 728 (11th Cir.1983)).  Here, the ALJ summarized the evidence regarding Plaintiff's mental impairments at length in finding that they did not amount to a severe impairment under the Regulations.  [R. 20-21].  Even if the ALJ failed to clearly articulate good cause for giving little weight to Dr. Sultana's opinion, which the Court finds that he did not, then the error would have been harmless.  The totality of the evidence considered by the ALJ supports the ALJ's decision to accord little weight to Dr. Sultana's opinion.

Dr. Reed Stone

As Dr. Reed Stone was another treating physician of Plaintiff, his opinion should have been accorded considerable weight unless the ALJ had good cause to not give it considerable weight and the ALJ clearly articulated his reasons for doing so.  Plaintiff saw Dr. Stone several times between February 11, 2010 and November 4, 2014.  [R. 391-96, 480-83, 485-86, 527-28, and 573-574].  On November 5, 2014, Dr. Stone completed a Physical Residual Functional Capacity Questionnaire [DE 565-68].

The ALJ assigned little weight to the opinion of Dr. Stone, Plaintiff's treating physician, because his opinion was not consistent with the record as a whole.  [R. 22].  The ALJ specifically explained that his reasoning for giving the opinion little weight was that Plaintiff's back pain is not accompanied by radiculopathy, Plaintiff does not require the use of an assistive device, and Plaintiff has full muscle strength in his upper and lower extremities.  *Id.*

The Court finds that the ALJ properly explained that he was giving Dr. Stone's opinion little weight and clearly explained his rationale for that finding.  Moreover, upon careful review of the record evidence, which is summarized above, and the ALJ's decision, the Court finds that the ALJ established good cause for not giving Dr. Stone's opinion considerable weight.  This

Court is not permitted to re-weigh the record evidence or substitute its judgment for that of the ALJ.

Dr. Anthony Rogers

Finally, as Dr. Anthony Rogers was another treating physician of Plaintiff, his opinion should have been accorded considerable weight unless the ALJ had good cause to not give it considerable weight and the ALJ clearly articulated his reasons for doing so. Dr. Rogers treated Plaintiff on February 13, 2013, March 13, 2013, and April 10, 2013. [R. 455-56, 424-25, 420-21]. On February 13, 2015, Dr. Rogers completed a form stating that he had treated Plaintiff from February 13, 2013, to April 10, 2013, and that Plaintiff suffers from cervicalgia, lumbago, lumbar stenosis, lumbar radiculopathy, lumbar herniated discs, myofascial pain, foot and ankle pain, and hypersomnelence. [R. 599]. Dr. Rogers stated Plaintiff's muscle spasm, lumbar MRI results, and decreased range of movement were consistent with Plaintiff's complaints of pain. *Id.* Dr. Rogers concluded that, during the period of time in which he treated Plaintiff, Plaintiff would have missed more than four days of work per month due to his pain, stress, and poor sleep. *Id.* Dr. Rogers further explained that he tried to control Plaintiff's pain so that Plaintiff could return to normal activity, but he never accomplished this goal. *Id.*

The ALJ assigned partial weight to the opinion of Dr. Rogers because Dr. Rogers was Plaintiff's treating physician, and his opinion was consistent with objective medical evidence showing some back pain. [R. 22]. However, the ALJ noted that the objective medical evidence also showed that Plaintiff "had full strength in his upper and lower extremities and a normal gait and station." *Id.*

The Court finds that the ALJ properly explained that he was giving Dr. Rogers' opinion partial weight and clearly explained his rationale for that finding. Moreover, upon careful review

of the record evidence, which is summarized above, and the ALJ's decision, the Court finds that the ALJ established good cause for not giving Dr. Rogers' opinion considerable weight. This Court is not permitted to re-weigh the record evidence or substitute its judgment for that of the ALJ.

B. Whether the ALJ properly evaluated Plaintiff's credibility and complaints of pain

Plaintiff argues that the ALJ "committed reversible error by misstating Mr. De Acosta's testimony and in failing to address the factors set forth in SSR 96-7p and 20 C.F.R. § 404.1529." [DE 22, pp. 14-15]. Plaintiff contends that he consistently testified at the hearing that he "stopped working because of difficulties he was having doing the job from a physical and mental standpoint" and that Plaintiff may have misused the term "laid off" at one point. *Id.* at p. 15. Plaintiff also argues that Dr. Rogers' note that Plaintiff was "laid off" is not inconsistent with Plaintiff's hearing testimony. *Id.* Plaintiff additionally notes that the ALJ seems to have doubted Plaintiff's credibility due to the lack of radiculopathy and normal gait, but Plaintiff argues that the ALJ "engaged in cherry picking as to both those items" and failed to address the factors set forth in SSR 96-7p. *Id.*

Defendant argues that substantial evidence supports the ALJ's credibility determination. [DE 24 at p. 9]. Defendant asserts that "[a]s the ALJ noted, Plaintiff's subjective complaints of disabling physical and mental symptoms were not consistent with objective medical evidence showing Plaintiff had normal muscle strength in all extremities, a normal gait, an ability to walk without an assistive device, a lack of radiculopathy, normal mental status findings, gaps in mental health treatment, and inconsistencies in the reasons he gave for stopping work." *Id.* at p. 10.

In reply, Plaintiff argues that the fact that he missed appointments at Jerome Golden "is not a basis for a lack of credibility unless the reasons for the appointments being missed is [sic]

identified." [DE 25 at p. 2]. Next, Plaintiff asserts that "an ALJ's finding as to a claimant's complaints of pain is distinguishable from the ALJ finding as to claimant's general truthfulness." *Id.*

The three-part pain standard requires: "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir. 1991). "When evaluating a claimant's subjective symptoms, the ALJ must consider such things as: (1) the claimant's daily activities; (2) the nature, location, onset, duration, frequency, radiation, and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) adverse side-effects of medications; and (5) treatment or measures taken by the claimant for relief of symptoms." *Rogers v. Berryhill*, No. 16-CV-21906, 2017 WL 5634303, at *10 (S.D. Fla. Nov. 6, 2017), report and recommendation adopted sub nom. *Rogers v. Comm'r of Soc. Sec.*, No. 16-21906-CIV, 2017 WL 5598660 (S.D. Fla. Nov. 21, 2017) (quoting *Davis v. Astrue*, 287 Fed.Appx. 748, 760 (11th Cir. 2008) (unpublished) (citing 20 C.F.R. § 404.1529(c)(3)(i)(vi)).

The ALJ attested that he had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all of the opinion evidence. [R. 19]. He then followed the two-step process—first, determining whether there is an underlying determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit his functions. *Id.* The ALJ summarized

31

Plaintiff's hearing testimony and found that the Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." *Id.* He went through the various medical records in detail and identified inconsistencies between the record evidence and Plaintiff's testimony at the hearing. [R. 19-21].

The ALJ also pointed out that the records show that Plaintiff's back pain is not accompanied by radiculopathy and that Plaintiff's back pain is not treated with chronic pain management or injections. [R. 19-20]. However, the ALJ also explained that Plaintiff had recently had trouble obtaining certain medical treatment for his back pain due to his lack of insurance and financial difficulties. [R. 20]. The ALJ found that, while the record does show that Plaintiff has some pain in his hands, he reported in 2013 that his hand numbness had improved and has only received conservative medical treatment for his carpal tunnel syndrome. *Id.* The ALJ explained that Plaintiff is obese and that his obesity is treated with medication. *Id.* Next, the ALJ determined that Plaintiff does not require the use of an assistive device and uses a cane at times despite never having been prescribed one. *Id.* Finally, the ALJ found that the objective medical evidence did not support Plaintiff's allegations about the severity of his mental impairments. [R. 20-21].

The ALJ specifically noted that Plaintiff's "inconsistent statements erode the credibility of his allegations." [R. 21]. The ALJ explained that Plaintiff had initially stated at the hearing that he was unable to work because of his disabilities; however, Plaintiff later stated that he had been laid off when confronted with evidence. *Id.* The ALJ found that "not being credible with this minor issue detracts from [Plaintiff's] credibility as a whole." *Id.* The ALJ concluded that

32

Plaintiff's subjective allegations were not "entirely credible" as they were not "well supported by and consistent with the overall evidence of record." *Id.* He did, however, add certain limitations to the RFC to account for Plaintiff's severe impairments. *Id.*

The Court finds that the ALJ properly followed the "pain standard" discussed in *Holt*. As stated in *Holt*: "If the ALJ decides not to credit such testimony, he must articulate explicit and adequate reasons for doing so." 921 F.2d at 1223. After a careful review of the record, the Court finds that the ALJ did articulate several explicit and adequate reasons for discrediting Plaintiff's testimony. This Court cannot reweigh the evidence or substitute its judgment for that of the ALJ.

With regard to the specific issue of whether Plaintiff misspoke when he said he was "laid off" at the hearing, as conceded by Plaintiff, Dr. Rogers also noted that Plaintiff was "laid off." Therefore, there was some supporting evidence in the record that Plaintiff may have misled the ALJ at the hearing. Regardless, even if the Court agreed with Plaintiff that the ALJ should not have found that Plaintiff was not being credible during the hearing, the ALJ provided several other reasons for finding Plaintiff's testimony regarding his pain not to be credible. [R. 19-21].

The Court finds that the ALJ's decision to discount Plaintiff's testimony about his subjective complaints is not erroneous in light of the record evidence. This is a case with an abundance of objective medical information which supports the ALJ's finding. There is substantial evidence to support the ALJ's denial of benefits to Plaintiff.

C. Whether the ALJ erred in relying on the vocational expert testimony

Plaintiff argues that the ALJ's hypothetical to the vocational expert was incomplete as it did not include Plaintiff's moderate difficulty with focus, concentration, and pace. [DE 22 at p. 17]. Next, Plaintiff argues that the vocational expert's testimony conflicts with the DOT because the ALJ limited Plaintiff's RFC to simple, routine, and repetitive tasks, and the jobs of information

clerk and usher include too high of reasoning levels to be considered simple tasks. *Id.* at pp. 17-18. Plaintiff contends that the ALJ and the vocational expert failed to identify this conflict and failed to explain how the conflict was resolved. *Id.* at p. 18.

Defendant argues in response that the vocational expert's testimony, along with the framework of the Medical-Vocational Guidelines, "provided the ALJ with substantial evidence that Plaintiff could perform other work and was not disabled." [DE 24 at p. 15]. Defendant points out that, "in the third step of the sequential analysis, the ALJ found that Dr. Castiglia's consultative psychological evaluation findings showed moderate difficulties with [concentration persistence, and pace] did not impede his ability to perform simple, routine, and repetitive tasks." *Id.* at pp. 15-16. Finally, Defendant argues that "Plaintiff's allegation that the jobs of information clerk and usher do not constitute simple work is merely Plaintiff's lay opinion," Plaintiff's lay opinion should be given less weight than the vocational expert's opinion, and Plaintiff failed to object to the vocational expert's opinion or present the ALJ with a "contrary position on the requirements of the identified jobs." *Id.* at p. 16.

In reply, Plaintiff first argues that "[a]s to whether the Claimant waived any challenges to the vocational testimony, it is suggested that adjudicating SSD claims is essentially a non-adversarial process and the ALJ has an independent duty to make a Step V determination that is consistent with the DOT." [DE 25 at p. 3]. Plaintiff also argues that the ALJ "had access to the DOT before issuing his ruling and a cursory review of the jobs identified by the VE could have been conducted." *Id.*

An ALJ may utilize the services of a vocational expert to make a determination as to whether a claimant can perform their past relevant work, given the claimant's residual functional capacity. 20 C.F.R. § 404.1560(b)(2). "In order for a vocational expert's testimony to constitute

substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Gordon v. Astrue*, 249 Fed.Appx. 810 812 (11th Cir. 2007). However, the ALJ need only include in the hypothetical claimant's impairments those that the ALJ has found to be supported by the evidence. *Id.* at 813.

The ALJ first posed a hypothetical in which an individual of the same age, education, and work experience as Plaintiff could work at the "light position level," but could only stand or walk for a total of four hours and sit for a total of six hours in an eight-hour workday, could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, could only occasionally handle and finger bilaterally, could never climb ladders, ropes or scaffolds, had to avoid concentrated exposure to vibration, environmental irritants, and hazards such as unprotected heights and dangerous machinery, and was only mentally capable of performing simple, routine, and repetitive tasks on a sustained basis. [R. 60]. The vocational expert explained that such an individual could not perform any of Plaintiff's past work. *Id.* He stated that such an individual could, however, perform the jobs of information clerk and usher. [R. 61]. With regard to the usher job, however, the availability of that job in the national economy would be eroded by 50% due to the individual's exertional level. *Id.* The ALJ posed a second hypothetical in which an individual had the same limitations stated before, except the exertional level was changed from light to sedentary. [R. 61]. The vocational expert testified that such an individual, due to the bilateral upper extremity restrictions, could not do any competitive work. [R. 62].

Plaintiff's counsel asked the vocational expert, in responding to the ALJ's hypothetical, whether the expert had taken into consideration the ability to maintain regular attendance and be punctual within the customary tolerance, as well as the ability to perform at a consistent pace. [R. 62]. The vocational expert responded that he had not considered those restrictions and offered to

35

answer any hypothetical Plaintiff's counsel wished to pose. *Id.* Plaintiff's counsel also asked if the two jobs the vocational expert had identified would be precluded if an individual was missing three to four days of work per month. [R. 63]. The vocational expert responded that the two jobs would be precluded. *Id.*

Plaintiff's counsel then posed a hypothetical in which an individual of Plaintiff's age, educational background, and vocational background could sit for no more than two hours and could stand and walk for no more than two hours in a workday. [R. 63]. The vocational expert responded that such an individual would not have any jobs available to him. *Id.* The vocational expert also stated that his testimony was in accordance with the DOT and supplemented by his professional experience working in placing people with similar disabilities. [R. 63].

At Step 3 of his analysis, the ALJ did find that Plaintiff had moderate difficulties with concentration, persistence or pace. [R. 17]. The ALJ also found that, Plaintiff "nonetheless can sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of simple routine and repetitive tasks on a sustained [basis]." *Id.* The ALJ cited to Dr. Stephanie Castiglia's notes from her December 3, 2013 general clinical evaluation with mental status. *Id.* Dr. Castiglia had found that Plaintiff's attention was mildly impaired; his concentration was intact; his calculation skill was intact; and his short-term memory was mildly impaired. [R. 521]. Thus, the ALJ carefully reviewed the record evidence, acknowledged Plaintiff's moderate difficulties with concentration, persistence or pace, and then determined that, based on the record evidence, Plaintiff could still complete simple routine and repetitive tasks.

The ALJ later determined that Plaintiff has

the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with additional limitations. He can stand or walk for a total of 4 hours, and sit for about 6 hours in an 8-hour workday. He can

36

occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, but never climb ladders, ropes or scaffolds. He can occasionally handle and finger bilaterally. He should avoid concentrated exposure to vibration, environmental irritants, and hazards, such as unprotected heights and dangerous moving machinery. [Plaintiff] is mentally capable of performing simple routine and repetitive tasks on a sustained basis.

[R. 18]. This residual functional capacity is supported by the record evidence. [R. 118-120].

The limitations contained within the ALJ's hypotheticals are the same as those contained within the ALJ's RFC for Plaintiff. The hypothetical questions presented to the vocational expert by the ALJ were consistent with the medical record evidence and other evidence. Thus, the Court finds that the ALJ's hypotheticals to the vocational expert properly comprised all of Plaintiff's impairments. See *Thornton v. Comm'r, Soc. Sec. Admin.*, 597 F. App'x 604, 612 (11th Cir. 2015) (finding that the ALJ did not err in omitting the plaintiff's moderate limitations in concentration, persistence and pace from the hypothetical to the vocational expert when the ALJ had already determined that the evidence demonstrated that the plaintiff could engage in "simple, non-detailed" tasks despite those moderate limitations.) The hypotheticals were not incomplete, and the ALJ properly relied on the vocational expert's testimony in determining that Plaintiff is not disabled.

Plaintiff's next argument is that the vocational expert's testimony conflicts with the DOT because the ALJ limited Plaintiff's RFC to simple, routine, and repetitive tasks, and the jobs of information clerk and usher include too high of reasoning levels to be considered simple tasks. Plaintiff is correct that the reasoning level in the DOT for an information clerk is a 4 and the reasoning level for an usher is a 2. Plaintiff is also correct that it appears, based on the relevant case law, that a reasoning level of 4 arguably conflicts with a "simple, routine, and repetitive tasks" limitation. *See, e.g., Menendez v. Colvin*, No. 12-21505-CIV, 2015 WL 1311460, at *4 (S.D. Fla.

Mar. 23, 2015) (citing a multitude of cases which have found that individuals who can carry out simple, routine and repetitive work can only perform level three or lower jobs); *Hall v. Astrue*, No. 2:09-CV-113-FTM-DNF, 2010 WL 5071003, at *8 (M.D. Fla. Dec. 7, 2010) (finding that a person who is limited to "simple, one-step tasks" cannot even work at a reasoning level of 2). However, there are cases that support the finding that a claimant who is limited to simple, routine and repetitive tasks can carry out level 2 jobs. *See, e.g., Leonard v. Astrue*, 487 F. Supp. 2d 1333, 1339 (M.D. Fla. 2007) ("it is evident that the VE's testimony that Plaintiff, who the ALJ limited to performing 'simple, repetitive tasks,' could return to her past work as a telemarketer conflicts with the reasoning level of three provided by the *DOT* for the position of a telemarketer.") Thus, the vocational expert's finding that Plaintiff can work as an usher is not in conflict with the DOT.

Regardless, "SSR 00–4p requires only that an ALJ resolve 'apparent unresolved conflict.'" *Menendez v. Colvin*, No. 12-21505-CIV, 2015 WL 1311460, at *6 (S.D. Fla. Mar. 23, 2015). In a 2012 case, the Eleventh Circuit found that no apparent inconsistency existed between a vocational expert's opinion and the *DOT* because "the ALJ asked the vocational expert if there were any inconsistencies between his opinion and the *DOT*, and the vocational expert responded that there were not," and the claimant "did not offer any evidence controverting the vocational expert's opinion, nor did she object to the opinion." *Leigh v. Comm'r of Soc. Sec.*, 496 F. App'x 973, 975 (11th Cir. 2012) (unpublished).

Similarly, in *Menendez, supra*, the ALJ specifically asked the vocational expert during the hearing as follows: "[D]o you understand that if you give us an opinion that conflicts with the information in the Dictionary of Occupational Titles that you need to advise us of that conflict and provide us with the basis for your opinion?" *Menendez*, 2015 WL 1311460, at *6. The vocational expert answered that he did understand, and the claimant's counsel never objected or

challenged the opinion and opted not to cross-examine the expert. *Id.* The court found that there was "no apparent conflict for the ALJ to resolve," so the ALJ was not required to address SSR 00–4p. *Id.*; *see also Gibson v. Astrue*, No. 1:09-CV-677-AJB, 2010 WL 3655857, at *15 (N.D. Ga. Sept. 13, 2010) ("Thus, because no conflicts between the VE's testimony and the DOT were raised at the hearing, the ALJ was not required to address SSR 00–4p at the hearing.")

Additionally, in a very recent case in this district, a Court found that remand was not required, in part, because the ALJ complied with SSR 00-4P by asking at the hearing whether the vocational expert's testimony was consistent with the DOT. *Sugarman v. Berryhill*, No. 15-CV-20332, 2017 WL 4868809, at *7 (S.D. Fla. Oct. 27, 2017). The court pointed out that the claimant, who was present at the hearing and represented by counsel, "did not raise any inconsistency after the VE gave this testimony, and did not seek further clarification on whether such a conflict actually existed. Thus, the ALJ properly relied on the vocational expert's testimony concerning the alleged conflict, and such reliance is supported by the substantial evidence. *Id.*

In the case at hand, the ALJ asked the vocational expert the following: "has your testimony been in accordance with the DOT?" [R. 63]. The vocational expert responded as follows: "[i]t's been in accordance, your honor, but also supplemented with my professional experience working in placing persons with similar disabilities." *Id.* Plaintiff's counsel did not ask any follow-up questions or object in any way. Therefore, there was no apparent conflict for the ALJ to resolve. Moreover, "[m]ost courts have held that the ALJ has no independent duty to investigate whether there is a conflict." *Roberts v. Colvin*, No. 14-22929-CIV, 2015 WL 12533132, at *2 (S.D. Fla. Sept. 1, 2015) *(citing Cousins v. Colvin*, No. 2:12-cv-505-FTM-29DF, 2013 WL 5278271, at *6 (M.D. Fla. Aug. 23, 2013).

## IV. <u>CONCLUSION</u>

The Court finds that the record contains substantial evidence to support the denial of benefits to Plaintiff.    The Court further finds that the ALJ applied the correct legal standards.

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED** that the decision of the Commissioner is **AFFIRMED**.    Accordingly, Plaintiff's Motion for Summary Judgment [DE 22] is hereby **DENIED**, and Defendant's Motion for Summary Judgment [DE 23] is hereby **GRANTED**.

Judgment will be entered separately.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 26th day of March, 2018.

WILLIAM MATTHEWMAN
United States Magistrate Judge